IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior Judge Richard P. Matsch

Civil Action No. 14-cv-01565-RPM

MARK STEPHEN ELLIS,

     Applicant,

v.

RICK RAEMISCH, Executive Director, Colorado Department of Corrections, and
JOHN W. SUTHERS, Attorney General, State of Colorado,

     Respondents.

---

## MEMORANDUM OPINION AND ORDER

---

Habeas Applicant Mark Stephen Ellis is a prisoner in the custody of the Colorado Department of Corrections. He is serving an indeterminate life sentence resulting from a jury verdict finding him guilty of four felony counts of sexual assault on a child by one in a position of trust, Colo. Rev. Stat. § 18-3-405.3(1)(23)(a); one felony count of sexual assault on a child under age 15 as part of a pattern of abuse by a person in a position of trust, Colo. Rev. Stat. § 18-03-405.3(1), (2)(b); and one misdemeanor count of child abuse, Colo. Rev. Stat. § 18-3-401(1)(7)(a)(V).[1] In this action for a writ of habeas corpus governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, Ellis maintains that his convictions were unconstitutionally obtained.

---

[1] Ellis has had three different judgments of conviction entered against him. [See Doc. 1, Exs. 2-4.] His most recent judgment of conviction, entered on January 30, 2009, reflects a sentence of 12-years-to-life on each of the four felony convictions for sexual assault by one in a position of trust; 15-years-to-life on the felony pattern of abuse conviction; and two years on the misdemeanor child abuse conviction. [Doc. 1, Ex. 4.] His sentences are running concurrently to each other.

The Colorado Court of Appeals ("CCA") summarized the facts of Ellis's case as follows:

> The marriage of defendant and Kari Ellis (mother) deteriorated, and they eventually divorced. During the time that defendant and mother were fighting and becoming estranged, one of their children, V.E., then ten years old, accused defendant of repeatedly sexually assaulting her.[2]

> Defendant was charged with various counts of sexual assault on a child, and child abuse. At the jury trial, V.E. testified that defendant repeatedly sexually assaulted her, and the People introduced evidence that defendant's semen was found on V.E.'s blanket. The jury also heard evidence that M.E., V.E.'s older brother, sexually assaulted her during the same time period as defendant.

[Doc. 1, Ex. 17 at 3-4.] Mark Ellis testified at trial and denied VE's allegations. The jury found him guilty on all counts.

Ellis appealed his convictions, asserting various federal constitutional errors in his trial. [Doc. 1, Exs. 5,7.] The CCA affirmed Ellis's convictions in a published decision. People v. Ellis, 148 P.3d 205 (Colo. App. 2006). [Doc. 1, Ex. 8.] The Colorado Supreme Court denied Ellis's petition for certiorari on November 27, 2006. [Doc. 1, Ex. 10.]

On July 3, 2007, Ellis filed a motion for postconviction relief pursuant to Colorado Rule of Criminal Procedure 35(c). [Doc. 1, Ex. 11.] Judge Plotz of the Jefferson County District Court held an evidentiary hearing on Ellis's motion for postconviction relief over the course of three-and-a-half days in February 2011. Judge Plotz denied Ellis' motion in a written order dated March 10, 2011. [Doc. 1, Ex. 13.]

Ellis appealed the denial of his postconviction motion to the CCA. [Doc. 1, Ex. 14, 16.] The CCA affirmed the district court's order in a written decision dated October 10, 2013. [Doc. 1, Ex. 17.] Ellis did not file a petition for certiorari to the Colorado Supreme Court. He initiated this habeas action on June 6, 2014. [Doc. 1.]

---

[2] VE began living with the Ellises as a foster child when she was two years old. [Tr. 8/20/02 at 319:7-11.] The Ellises adopted VE in May of 1998, when she was seven years old. [Id. at 320:9-14.]

## DISCUSSION

### A. Claim Three – Inadequate Record

Mark Ellis claims that he was denied due process of law guaranteed by the Fourteenth Amendment because there was no recording of the trial court's empanelment of the jury, including the voir dire questions and answers, which precluded appellate review of the trial court's denial of Ellis's challenge for cause to a juror who had been convicted of a felony.

Rowe Stayton, Ellis's trial counsel, waived the transcription of the voir dire phase of Ellis's trial. On direct appeal, Ellis filed a motion for limited remand to reconstruct the record of voir dire proceedings, which the CCA granted. Judge Munsinger, the presiding judge during Ellis's trial, held a hearing in an attempt to reconstruct the record. Neither the trial prosecutor, Judith Goeke, nor Rowe Stayton were available to participate directly in the hearing. Notwithstanding the reconstructed record, Ellis argued that it was insufficient for effective appellate review of his challenge to the jury selection proceedings. The CCA disagreed:

> Here, the trial court was able to reconstruct enough of the record to determine that the juror in question was, in fact, a convicted felon and that she was not on her county's voter registration list. The trial court also determined that defense counsel passed the jury panel for cause, but during or after exercising his peremptory challenges, and before the jury was sworn, defense counsel challenged the juror in question for cause. The trial court then rejected the challenge for cause on the merits. Therefore, the partially reconstructed record is sufficient to permit appellate review of Ellis's argument that the juror should have been disqualified based on those facts. Accordingly, that the voir dire proceedings were not fully reconstructed does not constitute reversible error.

Ellis, 148 P.3d at 208.

It is difficult to evaluate that ruling because it addresses only the fact that the juror had a felony conviction and was not a registered voter. Those facts did not disqualify the juror or indicate a lack of impartiality. In the absence of verbatim questions and answers, the CCA

could not know whether there was any other basis for excusing the juror for cause. Nonetheless, Ellis's claim must be denied because he has not demonstrated, as he must under the AEDPA, that there is clearly-established Supreme Court law holding that the absence of a verbatim record of voir dire for appellate review violates due process. <u>See</u> 28 U.S.C. § 2254(d)(1). The cases Ellis relies on, <u>Farley v. United States</u>, 354 U.S. 521, 522-23 (1957), and <u>Griffin v. Illinois</u>, 351 U.S. 12, 18 (1956), do not "clearly establish" that specific legal rule within the meaning of the AEDPA. <u>See House v. Hatch</u>, 527 F.3d 1010, 1015 (10th Cir. 2008) (concluding that reliance on "generalized legal principles" from prior Supreme Court holdings is not enough in this context).

Rowe Stayton waived transcription of closing arguments during Ellis's trial. Ellis has also raised the lack of a record of closing arguments as a due process violation. Ellis could have, but did not, fairly present this aspect of his inadequate record claim in state court on appeal or in postconviction proceedings, which he was required to do before raising it here. <u>See Castille v. Peoples</u>, 489 U.S. 346, 351 (1989). If he were to return to state court to raise it now, he would be barred by Colorado Rule of Criminal Procedure 35(c)(3)(VII). That rule is an independent and adequate state ground. <u>Burton v. Zavaras</u>, 340 Fed. Appx. 453, 454-55 (10th Cir. 2009) (unpublished) (finding Colo. R. Crim. P. 35(c)(3)(VII) to be adequate). This claim has been procedurally defaulted.

## B. Claim Two – Ineffective Assistance of Counsel

The protection of individual liberty provided by the Sixth Amendment to the United States Constitution requires that the accused in all criminal prosecutions enjoy the right to the effective assistance of counsel. Ellis's principal claim here is that Rowe Stayton's assistance before and at trial was ineffective.

4

Before discussing the merits of Ellis's ineffective-assistance claim, the Court must first address Respondents' contention that the claim was not properly exhausted because, while Ellis fairly presented the claim to the Colorado Court of Appeals, he did not raise it before the Colorado Supreme Court. [Doc. 6 at 14-17.] Ellis argues that the claim was exhausted by operation of Colorado Appellate Rule 51.1(a). [Doc. 8 at 9-12.]

Under Rule 51.1(a), when a claim has been presented to the Colorado Court of Appeals, and relief has been denied, "the litigant shall be deemed to have exhausted all available state remedies." Colo. App. R. 51.1. Respondents argue that, regardless of Rule 51.1, Ellis still "has the right" to raise these claims before the Colorado Supreme Court, and therefore, he does not satisfy the definition of exhaustion under the federal habeas statute. See 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted . . . , if he has the right under the law of the State to raise, by any available procedure, the question presented.") (emphasis added). But "there is nothing in the exhaustion doctrine requiring federal courts to ignore a state law or rule providing that a given procedure is not available." O'Sullivan v. Boerckel, 526 U.S. 838, 847-48 (1999). That is exactly what Rule 51.1(a) does; once a litigant raises a claim before the Court of Appeals and relief is denied, "all available state remedies" are deemed unavailable. Colo. App. R. 51.1 (emphasis added).

Respondents maintain that "the Tenth Circuit has suggested" that the failure of a litigant to raise a claim before the Colorado Supreme Court constitutes a failure to exhaust. [Doc. 6 at 15.] The Tenth Circuit cases Respondents cite either did not address Rule 51.1 or avoided deciding exhaustion in favor of reaching the merits. This Court has determined that, under Rule 51.1(a), exhaustion does not require that a litigant raise a claim in the Colorado Supreme Court if he has already raised it in the CCA and been denied relief. See Al-Yousif

v. Trani, No. 12-cv-01742, 2014 WL 252512 (D. Colo. Jan. 22, 2014) (Matsch, J.); Bell v.

Falk, No. 12-cv-02917, 2013 WL 156529, at *2-*4 (D. Colo. Jan. 15, 2013) (Babcock, J.);

Velasquez v. Faulk, No. 12-cv-02057, 2013 WL 394194, at *5-*6 (D. Colo. Feb. 1, 2013)

(Daniel, J.); Fletcher III v. Hartley, No. 09-cv-02119-BNB, 2010 WL 1610297, at *4-*5 (D.

Colo. April 20, 2010) (Brimmer, J.); St. James v. Zavaras, No. 09-cv-01174-BNB, 2010 WL

678130, at *6 (D. Colo. Feb. 23, 2010) (Arguello, J.).  In addition, four circuit courts have

held that state rules similar to Rule 51.1(a) eliminate the need to seek review in the state's

highest court to satisfy the exhaustion requirement.  See Lambert v. Blackwell, 387 F.3d 210,

233 (3d Cir. 2004); Adams v. Holland, 330 F.3d 398, 401–03 (6th Cir. 2003); Randolph v.

Kemna, 276 F.3d 401, 404–05 (8th Cir. 2002); Swoopes v. Sublett, 196 F.3d 1008, 1009–10

(9th Cir. 1999).  Accordingly, the Court concludes that Claim Two was exhausted by

operation of Rule 51.1 when Ellis raised it before the CCA and was denied relief.

In his Rule 35(c) motion for postconviction relief, Ellis argued that Rowe Stayton's

performance was deficient for three reasons:  (1) he failed to consult with and present the

testimony of a forensic psychology expert; (2) he failed to investigate and call witnesses who

would have been helpful to the defense; and (3) he made various mistakes in handling the

trial, such as ineffectively cross-examining prosecution witnesses, failing to object to

prosecutorial misconduct, and mishandling Rule 404(b) evidence.

Rowe Stayton testified at the hearing on Ellis's postconviction motion.  After saying that

he estimated that he had started defending child sexual assault cases since beginning his law

practice and guessed he had handled a couple hundred by the year 2002, Stayton said:

> When I would do at trial [sic] was tried to figure out in my mind, especially in child
> sexual cases, there is something after interviewing dozens, dozens of juries, that they
> always want to know why the child saying this [sic].

6

[Tr. 02/04/11 at 169:19-23.]  In response to a question as to his theory of Ellis's case, Stayton

said:

> This to me was a classic case of mom being really mad at him because there had -- there had been some allegations.  And I think I know that thereby a situation developed where Mr. Ellis went to the couch for a number of weeks or months.  I know that he -- the allegations came out formally, if the evidence is to be believed after some few weeks after he moved out of the house.

> There was evidence in this case, in my opinion, that Kari Ellis manipulated evidence and was the sponsor behind these allegations.  And things -- as things kept going on and on in the case, it still appeared to me that, in fact, more so than towards trial.

***

> In this case I felt that we could establish that [VE] was closer to mom, she'd aligned herself with mom, and I – mom, I thought, was out of control, frankly, from -- I don't know how else to say it -- I thought she was way in over her head in trying to manipulate the evidence.  That was my opinion.

***

> I was trying to establish, at least I attempted to establish throughout the trial, that Kari was really mad at Mark, and that what happened is that [VE] had read her mom, and she was more closely aligned with her mom and ergo we now have allegations.

[Id. at 177:25 – 178:11; 179:3-8; 198:16-20.]

Stayton testified as to why he did not call expert witnesses to testify about the scientific

literature relevant to the dysfunction in the Ellis family and child memory concepts:

> I think I didn't – it was essentially for a jury.  The reason, I mean, if you do think – and remember what's good for them, I attack them, they can attack me, and I -- I don't like a lot of attack, I don't want that in our case.  Here's why.  This is -- I have a feeling if you don't win these cases as the defense lawyer, in the prosecution case if you don't win them over there, you're not going to win on your side.  That's just a feel I have.

> The reason is, in general, the jury believes the child.  I don't care what we bring up, I don't care what we bring up in evidence, if they believe the child, it doesn't matter, they're going to find a way to rationalize it anyway.  So we need to -- we need to win the case.  And your side, I hate being this side, but anyway in your side of the case, if we don't I think we're in trouble.

7

But the problem is, ma'am, is that I actually I'm not mind lawyer [sic], I'm just a lawyer, I can use a view. My view would be completely wrong or where we are with the trial it could be. And I just felt we were -- I felt that we were -- I just felt from my perception that we were making the points that we should. That's what I felt.

[Id. at 200:23 – 201:21.]

Testimony at the Rule 35(c) hearing detailed Stayton's handling of pretrial matters. Richard Webb, the defense investigator in Ellis's case, testified that Stayton hired him (Webb) in April 2001, a month after Ellis was charged, and that after some initial case work, from May 2001 until October 2001, with the trial scheduled for February 2002, Stayton did not direct him (Webb) to investigate any case-related matters. [Tr. 02/02/11 at 54:1-5.] In November 2001, Webb sent Stayton a report recommending that Stayton attempt to obtain VE's therapy records; as well as her medical records and crime scene photos, which were relevant primarily to VE's allegation that, on one occasion, Mark Ellis sexually assaulted her after tying her to the bedposts of his and Kari Ellis's bed using neckties. Webb also recommended that Stayton subpoena the records of the Colorado Bureau of Investigation's ("CBI") serology analysis of evidence recovered from the Ellis home and arrange for an independent examination of that evidence. Webb advised Stayton to retain an expert in the field of psychology. According to Webb, Stayton did not follow those recommendations. [Id. at 56:19 – 57:20; 62:24 – 63:5; 64:8 – 66:5; 78:25 – 79:13.] Joe Snyder, the defense's crime scene consultant who was retained in November 2001, similarly testified that Stayton was not responsive to requests for crime scene photos, police reports, witness statements, and other materials. [Tr. 02/03/11 at 108:7-25.]

Webb testified that in January 2002, when the defense received a CBI report concluding that DNA from semen samples recovered from blankets found in VE's room belonged to

8

Mark Ellis, he (Webb) recommended that Stayton retain an expert on DNA testing. [Tr. 02/02/11 at 66:6-17.] Stayton did not retain Marc Taylor, the defense's DNA expert, until early July 2002, a month before Ellis's trial was set to commence following three continuances Stayton sought and received. [Tr. 02/04/11 at 185:14 – 186:23.] Webb also recommended in January 2002 that Stayton arrange for Webb and Joe Snyder to conduct a crime scene review of the Ellis home. Snyder explained to Stayton in early 2002 that he (Snyder) mainly wanted to review the crime scene so he could collect fiber evidence from the Ellis home relevant to VE's allegation of being tied to Ellis's bedposts and to the prosecution's theory that the semen-stained blankets were exclusively in VE's room. Stayton did not seek permission from the Court for Webb and Snyder to perform a crime scene review of the Ellis home until July 16, 2002—again, one month before trial. [Tr. 02/02/11 at 104:12-15.] When Stayton requested that permission, he told the Court that Webb and Snyder simply wanted to photograph the master bedroom and take measurements of Mark and Kari Ellis's bed; according to Webb and Snyder, Stayton did not seem to grasp the forensic evidence issues in the case or Webb and Snyder's stated purpose of collecting fiber evidence. [Id. at 107:6 – 111:8; Tr. 02/03/11 at 116:12-22.] Webb and Snyder did not go to the Ellis home until August 12, 2002, seven days before Ellis's trial. [Tr. 02/02/11 at 66:18-20.] Judith Goeke was present, and objected to Webb and Snyder's requests to collect fiber evidence as going beyond the scope of what was allowed by Judge Munsinger's order after the July 16 hearing. [Id. at 113:9 – 24.]

On August 15, 2002, at the urging of Taylor, Snyder and Webb, Stayton sought a fourth continuance of Ellis's trial so Taylor could independently test the DNA of the semen samples recovered by the CBI, which included the semen of VE's brother, ME, and explore further a

report of other cells that could have been from saliva; and so Snyder could obtain and test hair and fiber samples from the Ellis home. When DA Goeke objected to the continuance on the ground that Stayton should have done forensic testing sooner, Stayton attributed the delay in part to him having "a few things on my plate the last few months that required me to be out of the office . . . ." [Tr. 08/15/02 at 13:8-10.]   Judge Munsinger denied Stayton's requests as untimely and the trial proceeded without the testing Stayton's investigatory team and DNA expert requested.

Stayton explained at the Rule 35(c) hearing that when he said he had "a few things on his plate" before Ellis's trial, he was referring to the fact that his mother had shot herself in an unsuccessful suicide attempt around that time, which had resulted in a family dispute regarding who would be custodian of Stayton's older sister, who was a quadriplegic from an accident. [Tr. 02/04/11 at 249:23-250:9.] Stayton also acknowledged that his wife had filed for divorce in July 2002, the month before Mr. Ellis's case was tried. [Id. at 250:13-18.] Richard Webb testified that Stayton was in different trials the week before and the week after Ellis's. [Tr. 02/02/11 at 119:9-17.]

Dr. Philip Esplin is an expert in forensic psychology whom Stayton typically retained for sexual assault cases involving children. Stayton did not retain Dr. Esplin for Ellis's trial. Ellis's postconviction counsel hired Dr. Esplin. At the evidentiary hearing on Ellis's motion for postconviction relief, Dr. Esplin noted a number of aspects of the case that, in his view, made the testimony of a forensic psychologist necessary to Ellis's defense.

Dr. Esplin testified that it is not difficult to coach or train the witness testimony of a child aged 9-11 years and that there was evidence suggesting that Mrs. Ellis "was trying to micromanage the witnesses and trying to have some influence on the outcome of the case."

10

[Tr. 02/02/11 at 194:12-20.]   Dr. Esplin opined that from the records he had reviewed, the Ellis children were acting according to a pattern observed in high-conflict divorces known as alignment, where children say what they think the more-powerful parent (in this case, Mrs. Ellis) wants to hear to stay close with that parent.   [Id. at 194:21 – 195:13.]   Dr. Esplin suggested that VE and ME were actually engaging in sexual activity independent of Mark Ellis and that, in an effort to avoid adverse consequences, they came forward with a story that after VE told ME about what Mark Ellis was doing to her, ME decided he wanted to try it, too. [Id. at 199:3-11.]

Dr. Esplin questioned the reliability of VE's testimony.   Dr. Esplin testified that he had concerns from the perspective of memory science about the fact that as she proceeded through multiple interviews, VE seemed to feel that her memories as to what her father had supposedly done were getting better, whereas her memories as to what her brother had done were deteriorating.   [Id. at 201:11-25.]   Dr. Esplin was also deeply concerned that VE purported to just happen to "remember" that she had been sexually abused by ME soon after Kari Ellis had been informed that DNA lab results had come back indicating a second semen donor on one of VE's blankets.   [Id. at 205:25 – 208:14.]

Dr. Esplin also testified about the concept of negative stereotyping, in which a high-status adult in a child's life "makes negative, disparaging comments about an accused that could increase the risk of obtaining inaccurate information from the child."   [Id. at 204:1-5.]   Dr. Esplin opined that the fact that VE no longer referred to Mr. Ellis as her father but instead referred to him as "Dick Daddy" suggested that Kari Ellis was negatively stereotyping Mr. Ellis.   [Id. at 204:9 – 205:5; 208:18 – 209:22.]

Patrick Mulligan, who was Ellis' direct-appeal counsel, served as Ellis's expert regarding ineffective-assistance-of-counsel legal issues at the Rule 35 hearing. Mulligan was qualified as an expert in the field of trial advocacy at the hearing. [Tr. 02/03/11 at 140:12-17.] In his opinion, among the many deficiencies in Stayton's performance as Ellis's trial attorney, the most glaring was Stayton's failure to engage a forensic psychologist. [Id. at 198:22-199:24; 206:23-207:24; 215:18-24.] Mulligan testified that such an expert could have assisted the defense not only by helping Stayton prepare to cross-examine the prosecution's witnesses more effectively but also by taking the stand to explain relevant psychological concepts to the jury. [Id. at 219:24 - 220:14.] Such testimony, in Mulligan's view, would have been "extremely important . . . for the defense." [Id. at 199:3-6..]

Dr. Peter Long was VE's counselor. Kari Ellis testified that Dr. Long first treated VE "when she was approximately three or four"; then saw him "regarding the termination of parental rights with her biological mother"; and "then there were a couple years she did not see Dr. Long, and when the allegations came up, she started seeing Dr. Long again." [Tr. 08/21/02 at 89:7-13.] Stayton endorsed Dr. Long as an expert witness but did not interview Dr. Long or call him to testify at trial.[3] At the postconviction hearing, Dr. Long testified that he had never filed a report that Mark Ellis had sexually abused VE. Dr. Long recognized that, as a psychologist licensed in Colorado, he is obligated by law to make an official report if a child patient reports sexual abuse.

Rowe Stayton did not investigate or interview VE's older sister, Elizabeth Jefferson, before trial. Jefferson testified as a prosecution witness at trial. When Stayton cross-

---

[3] The CCA's finding that Stayton interviewed Dr. Long before trial [Doc. 1, Ex. 17 at 9] is not supported by the state record. Dr. Long testified at the postconviction hearing that he did not recall being contacted by Stayton. [Tr. 2/3/11 at 135:13-18.] That was the only testimony from the hearing on this factual issue

examined her, Jefferson testified that Kari Ellis never talked about the case in front of the Ellis children. [Id. at 123:12-17.] Nine years later, Jefferson testified at the postconviction hearing in Mark Ellis's favor.  Contradicting her trial testimony, Jefferson detailed examples of how Mrs. Ellis and ME had coached VE and rehearsed VE's trial testimony against Mr. Ellis.  [Tr. 02/03/11 at 36:23 – 37:19.] Jefferson also stated that Kari Ellis minimized ME's sexual assault of VE and blamed VE for what ME did.

Jessica Geer is the second eldest Ellis child.  Stayton did not call her to testify at trial.  At the postconviction hearing, Geer testified that after the investigation into VE's allegations against Mr. Ellis began, Kari Ellis made bizarre statements to the Ellis children; for example, that they needed to stay away from the windows of the house because otherwise Mr. Ellis was going to shoot and kill them.  [Id. at 55:6-9.]  Geer further stated that Kari Ellis had informed the children that their father's sperm "was found all over [VE]'s room." [Id. at 55:10-22.]  Geer testified that when she expressed her belief in her father's innocence, Mrs. Ellis threw Geer out of the house by having the police come and escort her away.  [Id. at 56:10-14.]  Geer explained that Mrs. Ellis had obtained a temporary restraining order by falsely alleging that Geer had attacked VE.  At the restraining order hearing, the judge found that Mrs. Ellis' allegations against Geer were not credible.  Geer described her mother as "very cruel and callous[,]" physically abusive, and verbally abusive, calling Geer fat, a slut, and accusing Geer of sleeping around—in Geer's words, "just things that mothers would not say to their children." [Id. at 62:15-24.]

Dr. Richard Spiegle was the psychologist who served as a court-appointed special advocate for the Ellis children during the Ellises' divorce.  Stayton endorsed Dr. Spiegle as an expert.  Stayton did not prepare Dr. Spiegle to testify at Mark Ellis's trial and did not call

him as a witness. Dr. Spiegle testified at the postconviction hearing.  During Dr. Spiegle's testimony, Ellis introduced letters written by Dr. Spiegle and other documents relating to Kari Ellis's effort to have Dr. Spiegle removed from his child advocate position, which Dr. Spiegle believed was motivated in part by his attempt to conduct an interview with ME. [Tr. 02/04/11 at 16:15-17.] Dr. Spiegle stated that, had he been able to testify at trial, he would have expressed his belief that certain of VE's allegations against Mark Ellis were inconsistent with memory science theory [id. at 21:19 – 22:10]; and that Kari Ellis's behavior and other facts suggested that parental alienation and alignment were occurring in the Ellis family [id. at 22:11 – 23:12].

Following the Rule 35(c) hearing, Judge Plotz denied Ellis's motion in a written decision on March 10, 2011.  [Doc. 1, Ex. 13.]  In that decision, Judge Plotz accepted the testimony of the witnesses presented by the defense as true but concluded that Stayton's performance was not deficient and that any weaknesses in his performance did not result in prejudice under Strickland.  [Id. at 9-11.]  This Court accepts Judge Plotz's factual findings regarding Ellis's witnesses as correct.  See 28 U.S.C. § 2254(e)(1).

Ellis appealed Judge Plotz's decision.  The CCA affirmed, agreeing with Judge Plotz that Stayton's performance was not deficient.  With regard to Stayton's failure to consult with and present testimony from an expert forensic psychologist, the CCA stated:

> At the postconviction hearing, trial counsel testified that he had worked on hundreds of sexual assault cases, and that he was familiar with the psychological concepts that an expert forensic psychologist would have explained. He testified that he elicited lay testimony at trial about the complicated family dynamics and children aligning with mother and against defendant. According to trial counsel, if he had called an expert forensic psychologist to testify on these issues, the People would have called their own expert in response. Trial counsel believed that such conflicting expert testimony would have damaged defendant's theory of the case. Thus, because trial counsel's decision not

to utilize a forensic psychologist was strategic, it was not constitutionally deficient. *See Strickland*, 466 U.S. at 689; *Davis*, 871 P.2d at 773.

[Doc. 1, Ex. 17 at 6-7.]   The CCA rejected Ellis's argument that Stayton's failure to

investigate, interview, and call Elizabeth Jefferson, Jessica Geer, Dr. Spiegle, and Dr. Long

to testify at trial constituted deficient performance:

> At the postconviction hearing, [Elizabeth Jefferson] testified that she and mother had been rehearsing with and coaching V.E. ever since V.E.'s initial outcry. In so testifying, [Elizabeth Jefferson] admitted that she lied at trial when, on cross-examination by trial counsel, she testified that mother never talked about the case in front of the children. Although defendant contends that trial counsel should have somehow discovered that E.J. was lying at trial, without more, we decline to hold that trial counsel was deficient for failing to know of a witness's apparent perjury.
>
> We also reject defendant's assertion that counsel was deficient because [Jessica Geer] and Dr. Spiegle would have testified at trial about the general conflict in the family, including how the fighting between defendant and mother caused the children to align with one parent or the other. Trial counsel brought this evidence before the jury by eliciting testimony about the conflict and resulting alignment from M.E. and [Elizabeth Jefferson]. *See Davis*, 871 P.2d at 773 ("[A]n attorney's decision not to interview certain witnesses and to rely on other sources of information, if made in the exercise of reasonable professional judgment, does not amount to ineffective assistance. Whether to call a particular witness is a tactical decision, and, thus, a matter of discretion for trial counsel." (internal citations omitted)).
>
> ***
>
> Trial counsel interviewed Dr. Long before trial, and it is unclear from the record whether Dr. Long was still treating V.E. at the time of the sexual abuse. The tactical decision not to call an expert witness is within the discretion of trial counsel. *People v. Bradley*, 25 P.3d 1271, 1275-76 (Colo. App. 2001). Thus, defendant has failed to overcome the "strong presumption that (trial) counsel's conduct [fell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

[Id. at 7-9.]   The CCA rejected Ellis's "miscellaneous trial errors" argument because

decisions regarding cross-examination and objections were within Stayton's discretion to

make. [Id. at 9.]   The CCA concluded: "Because defendant has failed to establish deficient

performance, his ineffective assistance claim fails, and we need not address whether trial

counsel's conduct prejudiced the defense." [Id. at 10.]

15

In his habeas Application, Ellis renews the same contentions regarding Stayton's performance in support of his (Ellis's) claim of ineffective assistance of counsel. There are two elements to an ineffective-assistance claim: deficient performance, and resulting prejudice. Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Supreme Court made clear that the performance of counsel must be judged according to an objective standard of reasonableness. 466 U.S. at 687. In reviewing the performance of trial counsel, a court must indulge, and a defendant must overcome, "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Id. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). Applying 28 U.S.C. § 2254(d)(1) to a state court's application of Strickland "is different from asking whether defense counsel's performance fell below Strickland's standard." Harrington v. Richter, 562 U.S. 86, 131 S. Ct. 770, 785 (2011). The state court is "granted a deference and latitude that are not in operation when the case involves review under the Strickland standard itself." Id. "The question," therefore, "is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.

The Supreme Court has said that while "the standard for counsel's performance is not determined solely by reference to codified standards of professional practice, these standards can be important guides," and has invoked the American Bar Association's Standards for Criminal Justice as a guide in the past. Missouri v. Frye, 132 S. Ct. 1399 (2012). Those standards provide, inter alia, that:

- Defense counsel should act with reasonable diligence and promptness in representing a client;

- Defense counsel should not carry a workload that, by reason of its excessive size, interferes with the rendering of quality of representation;

- Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction. The investigation should include efforts to secure information in the possession of the prosecution and law enforcement authorities.

*ABA Standards for Criminal Justice:   Prosecution and Defense Function* (3d ed. 1993) (Standards 4-1.3(a), (e); 4-4.1(a)).

While affording due deference to Mr. Stayton's performance and the CCA's decision, the Rule 35(c) hearing evidence shows that Rowe Stayton's performance was glaringly deficient. Stayton essentially delegated to Richard Webb, who is not an attorney, the responsibility to develop discovery strategies and approaches regarding the physical evidence in the case, then largely ignored Webb's recommendations.  Stayton also delayed hiring a DNA expert until one month before trial, and waited until the week before trial to seek important DNA and fiber evidence testing.  The only reasonable explanation for those omissions and decisions supported by the hearing evidence is that Stayton neglected developing evidence because he was in the midst of professional overload and personal crises in the time leading up to Ellis's trial.

Stayton's failure to interview and call a forensic psychologist to testify at trial was also deficient performance.  Stayton's principal theory of Ellis's defense was essentially that VE was not telling the truth about what happened.  It is therefore difficult to understand Stayton's decision not to call a forensic psychologist who could have provided the jury with a conceptual framework for understanding the complex dynamics in the Ellis family and with

17

an objective explanation as to why VE would have falsely accused Ellis of sexually abusing her. Both Dr. Esplin and Patrick Mulligan testified at the Rule 35(c) hearing that such testimony would have been extremely important for Ellis's defense. It is unreasonable to conclude, as the CCA did, that Stayton's decision not to call an expert was strategic simply because Stayton himself understood the concepts. The question is whether the jury understood them, and the Court fails to see how the jury could understand concepts that were not ultimately presented as such at trial. Further, Stayton's position that expert testimony was unnecessary and potentially counterproductive was directly contradicted by testimony that Stayton typically retained Dr. Esplin as an expert for sexual assault cases involving children and that he (Stayton) often had a "field day" with prosecution experts. Stayton's testimony on this subject appeared to be a post hoc rationalization of his conduct that contradicts the available evidence that he was simply not prepared for trial. See Harrington, 131 S. Ct. at 791 (courts may not indulge such rationalizations).

Stayton's failure to investigate, interview, and call other witnesses to testify regarding the disintegration of the Ellis family was deficient performance. Stayton's theory that VE was lying was also based on his contention that Kari Ellis, enraged by Mark Ellis's affair with another woman, manipulated VE and told her what to say to get back at Mark Ellis. And yet Stayton did not consult with or call to testify multiple members of the Ellis family and psychological professionals who were involved in VE's treatment and the Ellises' divorce proceedings and had firsthand insights into the severe dysfunction in the Ellis family and Kari Ellis's behavior following VE's initial outcry. The CCA rejected Ellis's claim of deficient performance based on Stayton's failure to call these witnesses by stating that Stayton "brought this evidence before the jury by eliciting testimony about the conflict and

resulting alignment from M.E. and [Elizabeth Jefferson, the oldest Ellis sibling]." [Doc. 1, Ex. 17 at 8.]   Both ME and Elizabeth Jefferson were prosecution witnesses; Stayton's decision to rely on cross-examining those witnesses as opposed to presenting witnesses favorable to Ellis and likely persuasive to a jury is inexplicable.

The primary duty of a criminal defense lawyer is to attempt to create sufficient skepticism about the evidence offered by the prosecution to establish a reasonable doubt in the mind of at least one juror about the prosecution's allegations against the accused. Stayton did not discharge that duty and fell well below the objective standard of performance established in Strickland. The bottom line is that Stayton tried Ellis's case without adequate preparation or an understanding of many important aspects of the case. He had theories, but he failed to investigate, develop, and present evidence to persuasively support those theories, and there is simply no strategic reason why he failed to do so. Rather, the evidence offered at the Rule 35(c) hearing showed that Stayton's performance was attributable to neglect, lack of preparation, and misguided self-confidence in his abilities. Because there is no reasonable argument that Stayton lived up to the minimum standard of representation guaranteed by the Sixth Amendment, the CCA unreasonably applied Strickland.

Although the CCA did not reach the prejudice prong of the Strickland standard, Judge Plotz adjudicated that aspect of Ellis's ineffective assistance claim as follows:

> While this court might be persuaded to find that trial counsel's performance was weak in some respects, the court cannot find that such deficiency prejudiced the result given all of the facts and circumstances of this case. The victim was sexually assaulted. She was also sexually assaulted by her brother, but she testified that the Defendant also sexually assaulted her. She has never recanted that testimony. The jury chose to believe her. Twelve people could have chosen otherwise but they did not.

[Doc. 1, Ex. 13 at 11.]. Accordingly, the Court will apply AEDPA's deferential standard to Judge Plotz's decision. See Atkins v. Zenk, 667 F.3d 939, 944 (7th Cir. 2012).

To satisfy Strickland's "prejudice" standard, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. "[T]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." Id. at 694. The "factfinder" in that oft-cited formulation is a member of the jury; thus, in the context of a criminal conviction, if counsel's errors would have led a *single* jury member to have a reasonable doubt regarding guilt, prejudice occurred.

A case in which the "verdict or conclusion [is] only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." Id. at 696. Here, there was no physical evidence of sexual assault on VE's person and there were no eyewitnesses to any of the alleged incidents. VE's testimony was the central evidence in the case. VE was ten years old at the time of her testimony in August 2002. She was testifying to events that allegedly took place up to three years before, when she was seven or eight years old. The plausibility of her account was subject to question, particularly because she first reported Ellis's abuse to Kari Ellis after her brother, ME, who had been sexually molesting her, persuaded her to do so. Accordingly, this is a case in which the jury's verdict did not have "overwhelming record support."

In rendering his decision on prejudice, Judge Plotz concluded that there was no prejudice because VE testified that Ellis assaulted her and the jury believed her, as if that were the beginning and the end of the question. A proper Strickland prejudice inquiry would have

been to analyze how evidence that was not presented due to Stayton's deficient performance would have impacted the jury's belief in VE.

The only physical evidence to support VE's testimony was two small semen stains matching Mark Ellis's DNA on blankets found in VE's room. The prosecution contended, with Kari Ellis's trial testimony in support, that the blankets came from VE's bed and were rarely, if ever, removed from VE's room. Stayton belatedly sought permission to gather and test forensic evidence to support Ellis's explanation that his semen got on the blankets because he used them when he slept on the living room couch, where he would occasionally masturbate, and to contradict VE's account of certain sexual incidents, particularly her claim that Ellis tied her to the bedposts of his bed on one occasion. Judge Munsinger denied that request as untimely, and so the jury was left without a sufficiently adversarial presentation of the physical evidence in the case. Although Marc Taylor testified at trial for the defense, he did so out of sequence, before the prosecution's DNA experts testified, and his testimony was limited by Judge Munsinger, who, upon Judith Goeke's objection, concluded that Stayton failed to give the prosecution adequate notice of certain aspects of Taylor's testimony, including his opinion on the age of the semen samples found on VE's blanket. The jury was left without adequate direction as to how to consider Taylor's testimony. [See Appendix A, Tr. 08/21/02 at 182 – 200.] Joe Snyder testified, but he was unable to address the physical plausibility of VE's claim that Ellis tied her to his bedposts because Stayton mishandled the pretrial investigation, which left Snyder without VE's height and weight, and without the opportunity to test the bedposts for the presence of fibers from neckties. Stayton's failure to interview and call to testify a host of witnesses with important information that Stayton did not elicit by cross-examining the prosecution's witnesses also

21

deprived the jury of a sufficiently adversarial presentation regarding matters bearing directly upon VE's credibility.

As Mr. Stayton testified, a jury in this type of case asks "why would this child say these things if they aren't true?"  Stayton's deficient performance meant that the jury did not have a plausible reason to answer that question negatively.  Because the evidence in the record did not overwhelmingly support Ellis's guilt, this Court finds and concludes that had the jury heard an effective defense presentation of the physical evidence in the case and the testimony of the witnesses presented by the defense in the Rule 35(c) hearing, at least one of the jurors would have had a reasonable doubt as to Ellis's guilt.  Thus, there would not have been a unanimous verdict of guilty on any counts.  Judge Plotz's decision to the contrary was an unreasonable application of the Strickland prejudice prong.

The Court is aware of the Supreme Court's admonition that the AEDPA and Strickland "do not permit federal judges to so casually second-guess the decisions of their state-court colleagues or defense attorneys . . . ."  Burt v. Titlow, 134 S. Ct. 10 (2013).  Upon review of the state court record, this Court finds that Rowe Stayton's performance fell below prevailing professional norms, that Stayton's deficient performance undermined confidence in the outcome of Ellis's trial, and that the state court decisions denying Ellis's ineffective-assistance claim constituted an unreasonable application of Strickland.

## CONCLUSION

For the foregoing reasons, the Court concludes that Mark Ellis received ineffective assistance of counsel, in violation of the Sixth Amendment, and is accordingly "in custody in violation of the Constitution . . . of the United States."  28 U.S.C. § 2254(a).  He is therefore entitled to habeas relief.  In fashioning a remedy, a habeas court has wide discretion to

"dispose of the matter as law and justice require." 28 U.S.C. § 2243. Exercising that discretion, the Court concludes that a conditional writ is appropriate here. See Hilton v. Braunskill, 481 U.S. 770, 775 (1987) ("[T]his Court has repeatedly stated that federal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court.")

In all other respects, Ellis's habeas Application is denied. Under 28 U.S.C. § 2253(c), a prisoner may not appeal the denial of his habeas application unless the presiding court issues a certificate of appealability ("COA"). A COA is required where the petitioner to whom a writ has been granted on one ground asserts, in opposition to the state's appeal, a ground that the district court rejected. Jones v. Keane, 329 F.3d 290, 296-97 (2d Cir. 2003). A COA will not issue unless the prisoner makes "a substantial showing of the denial of a constitutional right." Id. This requires a prisoner to demonstrate "that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003). The Court concludes that Claims One, Three and Four do not meet this standard. Thus, in the likely event Respondents appeal this decision, Ellis is not entitled to re-assert them as additional bases for relief.

Upon the foregoing, it is

ORDERED that Mark Stephen Ellis's Application for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 is granted. The State of Colorado shall initiate new criminal proceedings against Mark Stephen Ellis within 90 days, failing which he shall be released from custody.

23

Dated:  December 12, 2014.

BY THE COURT:

_____
Richard P. Matsch
Senior District Judge

# APPENDIX A

1   bedding.

2       Q       All right.  Now, you said on one of the
3   blankets there was found a mixture; is that correct?

4       A       That's correct.

5       Q       And what was CBI's conclusions regarding
6   that mixture?

7       A       Let me find the actual report so I don't
8   have to try to paraphrase it.

9               MS. GOEKE:  Judge, could we approach
10  before the witness answers that question?

11              THE COURT:  You may.

12              (A bench conference was held out of the
13  hearing of the jury.)

14              (The following proceedings were held
15  within the presence of the jury.)

16              THE COURT:  Would you re-ask your last
17  question?

18              MS. GOEKE:  May I ask the court reporter
19  to read back the last question?

20              (The last question was read back.)

21              THE COURT:  Is this in reference --
22  please approach.

23              (A bench conference was held out of the
24  hearing of the jury.)

25              (The following proceedings were held

1   within the presence of the jury.)

2           THE COURT:  I'm sorry, it's 2:42, let's

3   take our afternoon break for at least 15 minutes.

4   Please don't discuss the case among yourselves,

5   don't read or listen to any media, don't talk to

6   anybody else.

7           We'll take a 15 minute recess.

8           (Recess taken at 2:43 p.m.)

9           (The following proceedings occurred

10  outside the presence of the jury.)

11          THE COURT:  The record should reflect

12  we're outside the presence of the jury.  I am going

13  to -- I am inclined to grant the People's motion to

14  limit the examination to the matters contained in

15  this written report, this disclosure, because that's

16  my understanding of the rule, Rule 16 and what was

17  required.

18          It looked to me like from the question

19  that was asked --

20          MS. GOEKE:  Judge, hold on, I think it

21  would be appropriate if the witness steps out.

22          MR. STAYTON:  I'm going to need the

23  witness.

24          THE COURT:  Well, I have no problem, he's

25  an expert, he's not a fact witness, as such.  Let me

1    just tell you where I'm coming from.  It looked to
2    me like the second paragraph he was just repeating
3    in his second paragraph, he was repeating what the
4    findings were from CBI.  Now, I don't know whether
5    he agrees with those or doesn't agree with those,
6    and I thought if that has to do with the mix, I
7    thought that's what the question was about.
8             MR. STAYTON:  Yes, sir.
9             THE COURT:  Now, I don't see where he
10   expressed any opinions or disclosed any opinions as
11   to whether they had messed up, they didn't know what
12   they were doing.
13            MR. STAYTON:  I've actually asked if he
14   concurs with their findings, and he said yes.
15            THE COURT:  We're outside the presence.
16   Please, Ms. Goeke, if there are any questions that
17   you need to have clarified from the witness or as an
18   offer of proof --
19            MR. STAYTON:  I need to clarify something
20   to you.  Monday morning we had an objection to
21   Dr. -- Mr. Taylor testifying at all.  She said,
22   "I've gotten this letter, I don't have a report,"
23   and of course, the Court had our letter that he sent
24   in talking about some of the things he'd found, and,
25   et cetera, and then in there also asking for a

1    continuance because he need more time.  The Court
2    denied that motion, the Court, and we can get a
3    transcript, said he would fully let him testify and
4    will not prevent or limit the defense testimony.
5             Monday morning, we have this
6    conversation, so she's got this letter, she's
7    complaining because she can't talk to him.  So I set
8    up a telephone conference with the -- Mr. Taylor on
9    Monday night.  It's my understanding that Judith
10   calls him, talks to him, and she, basically, forgot
11   what she wanted to ask him.  She called, said she'd
12   call him back, and she never calls him back.
13            My point is, where we were in this
14   situation is that I, in no way, thought we're
15   limited only to this testimony, because of -- only
16   about this, because she had been given a chance to
17   interview him, and what we're asking about, I mean,
18   this stuff that we're talking about now actually
19   goes to the finding.  I asked him, Did you concur
20   with the findings in the mixture?  I think he should
21   be allowed to give an opinion about that or whether
22   he concurs with the findings.  If he does, fine, if
23   he doesn't, why not?  That's all, and what kind of
24   things he found in the mixture.
25            THE COURT:  Ms. Goeke?

1        MS. GOEKE:  Judge, here's my objection.
2  I don't think that I've been provided with a report.
3  I mean, again, I think --
4        THE COURT:  I'll consider this to be a
5  report, whether it's a letter or whatever.
6        MS. GOEKE:  Judge, but this is not a
7  report that contains opinions, this contains some
8  statements and some conclusions, but does not go on
9  to say, "And from this I draw these particular
10  opinions."
11        Furthermore, it's true, I talked to
12  Mr. Taylor, actually, it's the second time I talked
13  to him, I talked to him the Friday before trial, he
14  didn't feel like he could talk to me then, and he
15  can tell the Court, I called him probably six times,
16  I called him from home.  He was very cordial, we
17  actually did have a conversation.  I have three
18  pages of notes, but because of what he told me,
19  basically, he took a lot of wind out of my sails.
20  Basically, he said, "I don't have any question that
21  this is Mr. Ellis's DNA," and the only thing he was
22  going to testify to, because there were no
23  epithelial cells on the blanket, that he didn't
24  think that it could have happened from what I was
25  told, and he couldn't even tell me what he had been

1   provided with in terms of what he had reviewed.

2          He's telling me that's what he's going to

3   testify to, in a nutshell.  Well, that takes away a

4   lot of my concern that he's going to come in here

5   and testify at length about other matters, and at

6   the end, I said, "Well, I'm so tired I can't think

7   of what it was I wanted to say."  I'm sure

8   Mr. Stayton has something else to say.

9          THE COURT:  Well, make him work.

10          MS. GOEKE:  Judge, also, Mr. Stayton told

11   me, at least a couple times, he's only going to take

12   15 minutes.  We're beyond that, and so I think I was

13   sandbagged about the breadth and depth of his

14   testimony.  And for Mr. Stayton to come to the bench

15   and tell you the only thing I said to him is, "I'm

16   too tired, I can't think of anything else," to say

17   that, I've never heard anybody make so many

18   exaggerations.

19          MR. STAYTON:  That's enough, Judge --

20          THE COURT:  Hold on.  Hold on.  Hold on.

21          MR. STAYTON:  That's uncalled for.

22          MS. GOEKE:  We're at the bench and we're

23   arguing and you're lying on this.

24          THE COURT:  I don't consider, obviously,

25   we're in trial, it's tough on everybody.  Any

1   personal statements, he said this, she said that, we

2   don't need that, we really need to get through it,

3   and I understand people are tired, people are

4   scrambling, both sides, every which way.  So we

5   don't need to worry about who said what to whom.

6        MS. GOEKE:  I'm actually expressing this

7   more in amusement, that somehow this conversation

8   that generated three pages of notes is now being

9   portrayed to you as, 'Gee, I'm too tired.'

10       THE COURT:  I'm not considering that in

11  any in waiver of any rights you have.

12       MS. GOEKE:  I've been harping about

13  getting access to this expert, his opinions, from

14  way back.  You entered an order, we filed a motion,

15  and, you know, to be told over and over, well, you

16  could have called him and that takes care of

17  everything.  We're in the heat of trial, he's

18  testifying to things that I don't believe are

19  covered by the letter or our conversation.

20       I'm not faulting him, I don't think he

21  knew what he was going to come here and testify to,

22  but just a few of the notes I wrote, we're hearing

23  about tears containing epithelial cells, skin cells,

24  how the mattresss and sheets would have that.  He's

25  been asked about the CBI results themselves, why is

1   that relevant?  I'm going to call two people from

2   CBI, now I'm thinking I don't really need to call

3   them because he's getting in my results, and so I

4   wouldn't have consented to have him taken out of

5   order.

6           The defense is putting this on, and the

7   prosecution isn't.  You're hearing all this the

8   first time from the defense, this is what I

9   understood he was going to testify to, and perhaps I

10  did not ask him the right questions, but, you know,

11  what I understood he was going to testify to were

12  two issues, one is that there was an inconsistency

13  between the number of sperm cells that Ms. Woods,

14  the serologist, saw, versus what Mr. Arndt saw, and

15  that's covered, and the second is the lack of

16  nucleated epithelial cell count taken from any of

17  the blankets.

18          I've already let him go far astray.  I'd

19  like to make it worth it to be here, but I have to

20  put my foot down.

21          MR. STAYTON:  Your Honor, that's where

22  he's going with it, that's where we were about to go

23  with the last paragraph.

24          THE COURT:  I understand.  Will you give

25  us, in addition to what he's already testified, will

1   you make a brief statement, in the nature of offer

2   of proof or maybe you want him to state it out of

3   the presence, what is the most efficient way to do

4   it as to what additional opinions you're going to

5   ask him about?

6           MR. STAYTON:  We're going to be talking

7   about the epithelial, the background.

8           THE COURT:  You talk about the

9   background?

10          THE WITNESS:  Talk about the background

11  DNA.

12          MR. STAYTON:  Which goes to the fourth

13  paragraph; is that right, about the levels of sperm

14  DNA?

15          THE COURT:  This is an offer of proof.  I

16  want to know what you're anticipating the additional

17  testimony would be from this point on, in front of

18  the jury.  Someone needs to tell me.

19          THE WITNESS:  I think where we were going

20  was to talk about the report from CBI that

21  discussed -- that on the sample, No. 4, they saw a

22  mixture and that there was, in addition to this

23  primary profile, that the primary profile in both

24  the sperm fraction and epithelial cell fraction came

25  from Mr. Ellis, and that this is the type of thing

1   we see when we have very low quantities of material

2   from another donor, because semen has primarily

3   sperm DNA.  But, secondarily, it also has nonsperm

4   DNA, and what we have here is these very low levels

5   of somebody else, that they have not concluded a

6   source of origin for.

7           They then went back and took a sample

8   substrate control to determine whether or not there

9   was material in the background, and, indeed, they

10  got low levels of material in the background,

11  another, and, again, it was deemed to be

12  inconclusive as far as who it originated from;

13  however, there are shared alleles between what they

14  found in the background substrate and what was found

15  in the background here, so that leaves us with a

16  situation where a simply neat semen applied to this

17  blanket would give us what they've detected.

18          THE COURT:  That's substantially the

19  opinion you're going to be -- the rest of your

20  testimony -- proposed testimony?

21          MR. STAYTON:  Well, basically, we were

22  going to ask some hypotheticals, if you had had

23  repeated ejaculation on a blanket, would you expect

24  to find that low of levels of ejaculate.

25          THE COURT:  Thank you.

1       Ms. Goeke?

2       MS. GOEKE:  Well, again, I don't see that

3   in this letter, and first of all, nothing about

4   background DNA, I don't know if that's a term of

5   art.  Again, it's not something I know about in a

6   timely manner, so I can research, I can go on the

7   internet, I can ask my experts, I can consult

8   another expert.  If that's his opinion, that's not

9   what it says here, it doesn't say anything about

10  conclusions, about the source of origin, material in

11  the background, or shared alleles.  All it says is,

12  based on the description of the events, we would

13  expect to see much larger quantities of DNA.  I'm a

14  layperson where this stuff comes in, and to me,

15  those are two different things.

16      MR. STAYTON:  There's nothing

17  inconsistent with what he just told you and what she

18  just said.

19      THE COURT:  I understand.  Let's get the

20  jury.  I'm sorry, we're on a break.  I am not

21  passing on hypotheticals because I don't know what

22  the hypotheticals are.

23      MR. STAYTON:  You just heard it, that's

24  all I was going to ask.

25      THE COURT:  I find on the statement based

1   on a nonsperm cell DNA, I assume if it's a nonsperm

2   cell, you're talking about this mixture or what was

3   in the mixture, I don't see anything -- well, he

4   said there were less than picograms per microliter.

5            I'll allow the testimony, as I understand

6   it.  I'll overrule your objection.  I feel that this

7   is sufficient, as I heard it explained within the

8   letter dated August 12, 2002, so I will not preclude

9   the testimony as it's been offered.

10            If it's anything different than what's

11  been said, please object.

12            MS. GOEKE:  How about ruling he can

13  testify to what's in the letter, because that's what

14  I'm prepared to cross him on?

15            THE COURT:  How about what?  I'm sorry.

16            MS. GOEKE:  If he would testify

17  consistently to what is in his letter, I wouldn't

18  make an objection.

19            THE COURT:  He can, and you may,

20  obviously, cross-examine if he testifies differently

21  or inconsistently with what's in the letter.

22            Obviously, it's my understanding, based

23  on the representation, the offer of proof, that the

24  questions he is going to be asked or he is going to

25  testify or is represented, is consistent with the

1   letter, and if I misunderstood or if he testifies

2   inconsistent with the letter, and it's pointed out,

3   I'll inform the jury to strike the testimony and

4   disregard it.

5               MS. GOEKE:  Thank you.

6               THE COURT:  When are they coming back?

7   We're going to take about 10 minutes, this will be

8   your afternoon break.  We'll be in recess for ten

9   minutes.

10              (Recess taken at 2:58 p.m.)

11              (The following proceedings were held

12  within the presence of the jury.)

13              THE COURT:  Thank you be seated.

14      Q      (By Mr. Stayton)  Mr. Taylor, I had asked

15  you about the CBI findings and conclusions regarding

16  the semen found on one of the blankets, and the

17  mixture, and that was in the context of a background

18  issue?

19      A      That's right.

20      Q      Did you review -- did you review the

21  findings and conclusions of CBI of the semen state

22  reported to have a mixture?

23      A      Yes.

24      Q      Were there high levels in the mixture you

25  have -- what does the mixture mean?  What are they

1   talking about a mixture?

2        A      Well, in this case, there were two

3   samples that had sperm and sperm DNA that were

4   attributable to Mr. Ellis.  In one of those, all

5   they could see in it was DNA coming from Mr. Ellis,

6   this is just a neat semen stain, that's all that was

7   detected.

8                In the other one, this would have been

9   sample No. 4, they relate that there is a mixture,

10  and let me just read their conclusion paragraph on

11  this, where they say, "The DNA profile topped from

12  item No. 4 sperm, and for epithelial, reveal the

13  presence of mixtures, the major component --

14               THE COURT:  Let me interrupt, because, I

15  apologize, I think he responded, you asked him if he

16  agreed.

17               MR. STAYTON:  I did ask him that.

18               THE COURT:  I didn't follow that he's

19  responding to a question.  Go ahead and ask another

20  question.

21        Q      (By Mr. Stayton)  We talked about the

22  background, do you mean that background DNA?

23        A      Yes.

24        Q      Now, the mixture is the mixture of the

25  DNA the levels of the other DNA, the person that's

1   not Mr. Ellis or persons or just one person, can you

2   tell?

3        A     You can't tell for sure.

4        Q     Is that level of DNA found in that

5   consistent, within a reasonable degree of scientific

6   certainty, consistent with background DNA?

7        A     It's at a very, very low level, because,

8   as I was saying, semen has two components to it, the

9   sperm and then all the nonsperm cells, which are

10  cells which are lymphocytes, white blood cells,

11  these are at a much lower level.  Even at that very

12  low level, that is the primary profile we see in the

13  epithelial cell fraction is DNA consistent with the

14  sperm donor or semen donor in this particular case.

15       In addition to that, we've got very, very

16  small level peaks that come up that are from

17  somebody else.  Now, these are in a range where it's

18  similar, at this very low level, to what we see just

19  in the background on this blanket, from other

20  testing that was done.

21       So we have no idea, if I take my coat

22  here, my DNA is on this coat.  If I take another

23  individual's semen and put a very tiny drop of it on

24  my coat and you test that, what you'll get is that

25  individual's sperm and epithelial cells and then

1  background on that, my DNA, that doesn't mean my DNA

2  was mixed with the semen, it's simply been laid on

3  top of an item that had my DNA in it.

4      Q      When they say "mixture", that may not be

5  a mixture, that means it's laid on top of previous

6  background DNA?

7      A      That's right.  We cut out a chunk and

8  extract it, and you get a mix of the DNA.

9      Q      Now, we've discussed about nonnucleated

10  epithelial cell counts taken from the blankets, what

11  is that?  What is nonnucleated epithelial cell

12  counts?

13      A      Nucleated epithelial cells are the cells

14  that line the inside of the mouth, the inside of the

15  vagina, various other areas such as this, but

16  primarily, those two.  And what we find is these are

17  cells that are part of what we call a mucus

18  membrane, which is a moist membrane like that.  Like

19  the inside of the mouth, the cells continuously

20  migrate to the surface, then they slough off in

21  saliva.  If I take a little bit of saliva, you've

22  got a bunch of these cells in it, we look for those

23  cells when we're examining these things

24  microscopically, then we're looking at the nucleated

25  epithelial cells.

1    Q    Were there high levels or low levels of

2  nucleated epithelial cells found in the blankets?

3    A    They did not give a count for nucleated

4  epithelial cells, they just didn't state it at all.

5  Based on the amount of DNA, there's very little, if

6  any, we don't know what the DNA is actually coming

7  from.

8    Q    Now, Mr. Taylor, based off your

9  experience in forensics and your experience in DNA

10  collection and analysis, if, in this particular

11  situation, there had been allegations of repeated

12  ejaculation on a particular blanket or blankets over

13  a period of months, even over years, would you have

14  expected to find higher levels of sperm or semen on

15  the blankets, within a reasonable degree of

16  scientific certainty?

17    A    I would have expected to find higher

18  levels.  The amount from even a single ejaculation

19  certainly is much more than what we're finding here.

20  The other thing that's different, of course, about a

21  blanket than other types of sources, for example, a

22  vaginal swab, semen in the vagina is washed out as

23  vaginal secretions come out and eclipses itself.  A

24  semen stain on an item such as a blanket can last

25  for many, many years and be fully detectable.  I've

1    actually tested one that was 25 years old, stored in

2    a desk at room temperature.  We detected sperm on

3    it, we get a beautiful profile on this.

4        Q    So you couldn't venture a date when

5    those --

6        MS. GOEKE:  Objection, again, same basis,

7    and I would ask that that testimony be stricken.

8        THE COURT:  Sustained.

9        MR. STAYTON:  It wasn't answered.

10       THE COURT:  It wasn't answered?

11       MR. STAYTON:  No.

12       THE COURT:  Disregard the last question.

13       MS. GOEKE:  I'm asking for them to

14   disregard the whole aging thing.

15       THE COURT:  I can't hear you.

16       MR. STAYTON:  He didn't answer it.

17       THE COURT:  Yeah, I didn't hear an

18   answer.  I told them to disregard the question

19   about, 'Can you tell how old this is?'

20       MS. GOEKE:  Well, I'm talking about the

21   prior testimony to that, it's not relevant if you're

22   not going to let him answer that last question.

23       THE COURT:  I'll review that, and you can

24   remind me, but let's go ahead with our

25   cross-examination.

1    You're to disregard the last question,
2 but I didn't hear an answer.  If you heard an
3 answer, disregard the answer.
4                CROSS-EXAMINATION
5 BY MS. GOEKE:
6    Q    Good afternoon.  As I understand your
7 answer, that you would expect to find more semen
8 under that hypothetical than what was detected on
9 the blanket here?
10    A    If there was an ejaculation, yes.
11    Q    And you're talking about what you would
12 call a complete ejaculation, correct?
13    A    Yes, that's correct.
14    Q    And I think you said a complete
15 ejaculation, and I'm kind of paraphrasing, but a
16 complete ejaculation in a normal, physically healthy
17 male, is in a quantity, I think you compared it to
18 about a thimble full?
19    A    It would be about three-and-a-half
20 thimble fulls.
21    Q    And millions and millions of sperm within
22 that, typically?
23    A    That's correct.
24    Q    So if you had numerous complete
25 ejaculations, you would have thimble fulls of semen